$400

**JFL**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL UNION NO. 98 HEALTH & WELFARE FUND, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL UNION NO. 98 ZONE 2 PENSION PLAN, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL UNION NO. 98 PROFIT SHARING PLAN, ELECTRICAL WORKERS JOINT APPRENTICESHIP AND TRAINING TRUST FUND,and LABOR MANAGEMENT COOPERATIVE COMMITTEE 1719 Spring Garden Street Philadelphia, PA 19130, and LOCAL UNION 98 OF THE INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS 1701 Spring Garden Street Philadelphia, PA 19130, Plaintiffs, v. MBR CONSTRUCTION SERVICES, INC. 307 June Avenue Blandon, PA 19510 and BRENDAN FIELD c/o MBR Construction Services, Inc. 307 June Avenue Blandon, PA 19510 Defendants. | : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : | CIVIL ACTION NO.  **19    1413** |

## COMPLAINT

### JURISDICTION AND VENUE

1.     The jurisdiction of this Court is invoked pursuant to §502(a)(3)(B), (d)(1) and (f)

of the Employee Retirement Income Security Act (hereinafter "ERISA"), 29 U.S.C. §§1132

(a)(3)(B), (d)(1) and (f), and §301(a) of the Labor Management Relations Act (hereinafter "LMRA"), 29 U.S.C. §185(c).

2.     This Court is one of proper venue under ERISA §§502(e)(2) and 4301(d), 29 U.S.C. §§1132(e)(2) and 1451(d), respectively, and the LMRA, 29 U.S.C. §185(a), because all Plaintiffs have offices in the Eastern District of Pennsylvania and the breach occurred in the Eastern District of Pennsylvania.

**PARTIES**

3.     At all times relevant hereto, Plaintiffs International Brotherhood of Electrical Workers Local Union No. 98 Health & Welfare Fund (successor to the Local Union 98 Zone 2 Health & Welfare Plan) (hereinafter the "Health Plan"), International Brotherhood of Electrical Workers Local Union No. 98 Zone 2 Pension Plan (successor to the Local Union 380 Pension Fund) (hereinafter the "Pension Plan"), International Brotherhood of Electrical Workers Local Union No. 98 Profit Sharing Plan (successor to the Local Union 98 Annuity Plan) (hereinafter the "Profit Sharing Plan"), Scholarship Fund of the IBEW Local Union 98 (hereinafter the "Scholarship Fund") and Electrical Workers Joint Apprenticeship and Training Trust Fund (hereinafter the "Apprenticeship Fund") (hereinafter collectively the "Funds") are trust funds established under 29 U.S.C. § 186(c)(5) and "multiemployer plans" and "employee benefit plans" within the meaning of 29 U.S.C. § 1002(37), (1), (2) and (3).

4.     At all times relevant hereto, Plaintiff Labor Management Cooperative Committee (hereinafter "LMCC") is a joint labor-management cooperation committee created pursuant to Section 6(b) of the Labor Management Cooperation Act of 1978, 29 U.S.C. §175(a), and Section 302(c)(9) of the Labor Management Relations Act, 29 U.S.C. §186(c)(9).

2

5.      At all times relevant hereto, Plaintiff Local Union 98 of the International

Brotherhood of Electrical Workers (hereinafter "Local 98") is an unincorporated association

commonly referred to as a labor union, and is the exclusive representative for the purposes of

collective bargaining  of certain employees of Defendant MBR Construction Services, Inc. who

are and/or were employed in an industry affecting interstate commerce within the meaning of 29

U.S.C. §§152(5), (6) and (7), 185(a) and 1002 (4), (11), and (12).

6.      Local 98 is a successor to the International Brotherhood of Electrical Workers,

Local 380.

7.      Plaintiffs maintain their principal place of business and are administered from

offices listed in the caption which are located in the Eastern District of Pennsylvania.

8.      Defendant MBR Construction Services, Inc. (hereinafter the "Employer") is an

employer in an industry affecting commerce within the meaning of 29 U.S.C. §§152(2), (6) and

(7), 1002(5), (11) and (12) which maintains the business address listed in the caption.

9.      Defendant Brendan Field (hereinafter "Field") is an owner and/or officer of the

Employer with control over the assets of the Employer. Field maintains a business address listed

in the caption.

10.     Defendant Employer has adopted and agreed to be bound by the Inside

Commercial Agreement between the Penn-Del-Jersey Chapter, NECA and Local 98 (hereinafter

the "CBA"). By virtue of the CBA, the Employer agreed:

(a)      to deduct contractual deductions from the paychecks of employees covered by the
collective bargaining agreement and to remit those amounts, and to pay contractually
required contributions, to the Funds, LMCC, and Local 98 (collectively the "Plaintiffs");

(b)      to file monthly remittance reports with the Plaintiffs listing all employees for
whom contributions were due under the collective bargaining agreement and the total
number of hours each such employee worked during that month;

3

(c)     to produce, upon request by the Funds, individually or jointly, all books and records deemed necessary to conduct an audit of the Employer's records concerning its obligations to the Funds; and

(d)     to pay liquidated damages and all costs of litigation, including attorneys' fees, expended to collect any amounts due as a consequence of the Employer's failure to comply with its contractual obligations as described in subparagraphs (a), (b), or (c).

A true and correct copy of the CBA is attached hereto as Exhibit A.

11.     Pursuant to Article VI, Section 6.06(d), of the CBA, any contribution that is not

received by its due date is charged interest at the Internal Revenue Service rate. Exhibit A, p. 30.

12.     Pursuant to Article VI, Section 6.06(d) of the CBA, late payments are also

charged liquidated damages equal to ten percent (10%) of the principal delinquency. Exhibit A,

p. 30.

## COUNT ONE
## Plaintiffs v. Employer

13.     The above paragraphs are incorporated herein by reference as though duly set forth at length.

14.     Defendant Employer failed to pay $29,838.49 in principal contributions for

February 2018, and $52,072.39 in principal contributions for March 2018, for a total delinquent principal of $81,910.88.

15.     As of March 15, 2019, that delinquency accrued $3,105.24 in interest and was assessed $8,191.09 in liquidated damages.

16.     In addition, the delinquent principal contribution has and will accrue interest on a daily basis until paid after March 15, 2019 in accordance with the CBA, and 29 U.S.C. §1132(g)(2)(B).

4

17. On July 17, 2018, Plaintiffs, through their attorney, sent a letter to the Employer demanding payment of the delinquency. A true and correct copy of the July 17, 2018 letter is attached hereto as Exhibit B.

18. Despite that notice and demands for payment, the Employer has failed and refused to respond or otherwise pay the above amounts.

19. In addition to the principal, interest, and liquidated damages set forth above, Defendant Employer owes to Plaintiffs attorneys' fees and costs of litigation, pursuant to Article III, Section 6.06(b) of the CBA (Exhibit A, p. 29), and 29 U.S.C. §1132(g)(2)(D).

WHEREFORE, Plaintiffs ask that the Court:

(1) Enter judgment in favor of the Plaintiffs and against Defendant Employer for $81,910.88 in unpaid principal contributions, pursuant to the CBA and 29 U.S.C. §1132(g)(2)(A);

(2) Enter judgment in favor of the Plaintiffs and against the Defendant Employer for $3,105.24 for interest as of March 15, 2019, pursuant to the CBA and 29 U.S.C. §1132(g)(2)(B);

(3) Enter judgment in favor of the Plaintiffs and against the Defendant Employer for such additional interest that accrues on the amounts set forth in (1) after March 15, 2019, calculated at the I.R.S. rate, pursuant to the CBA and 29 U.S.C. §1132(g)(2)(B);

(4) Enter judgment in favor of the Plaintiffs and against the Defendant Employer for $8,191.09 in liquidated damages, pursuant to the CBA and 29 U.S.C. §1132(g)(2)(C);

(5) Enter judgment in favor of the Plaintiffs and against the Defendant Employer for attorneys' fees and costs, pursuant to the CBA and 29 U.S.C. §1132(g)(2)(D); and

(6) Grant any other further relief the court finds just and proper.

## COUNT TWO
### Funds v. Field

20.     The above paragraphs are incorporated herein by reference as though duly set forth at length.

21.     Section 6.07 of the CBA states that the contributions to the Plaintiff Funds that are not yet paid "are and shall be considered as assets of the respective Funds from the date on which the hours or wages… for which the Employer is obligated to pay contributions to the respective Funds accrue" and that "any right, title or interest to any sum payable by the Employer to the Fund and title to all such amounts… shall be vested in the trustees of the respective funds." Exhibit A, p. 30.

22.     Section 6.07 of the CBA also requires the Employer "to set aside in a segregated account funds equal to the amount of its contributory obligation… and such amounts shall be deemed held in trust by the Employer for payment to the respective Funds and the Employer is prohibited from using such amounts for its own purposes or for the benefit of any other person." Exhibit A, p. 30.

23.     Pursuant to the above-quoted provisions of the CBA, the title to and possession of all monies which are contributions to be paid into the Funds are vested in the Trustees of the Funds as of the date the Employer's obligation to contribute arises.

24.     Once employees of the Employer performed bargaining unit work, the monies due to the Funds became an asset of the Funds upon the date such amounts became due pursuant to the CBA.

25.     At all relevant times, Defendant Field, has been and is a principal officer and/or owner of the Defendant Employer. In this capacity, Field was ultimately responsible for preparing, reviewing, authorizing payment and submitting monthly report and contributions to

6

the Plaintiff Funds, and he exercised control over the disposition of money that became a plan asset immediately upon the date the Employer's obligation to contribute arose.

26. Based on the functions that Field performed, Field maintained both formal and practical authority to direct that proper fringe benefit contributions be paid to the Plaintiffs at all times relevant hereto.

27. Based on the functions Field performed, he exercised authority and control over the management and disposition of certain Fund assets.

28. As a result of exercising control and management over Fund assets, the Field is a fiduciary under ERISA.

29. Under ERISA, a fiduciary is required to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries... for the exclusive purpose of... providing benefits to [them]." 29 U.S.C. §1104(a)(1).

30. A fiduciary who uses Fund assets to satisfy other personal or business obligations breaches the fiduciary duty under ERISA.

31. Because Field willfully and intentionally used Fund assets contained within their personal accounts and the accounts of Defendant Employer for purposes other than the exclusive purpose of providing benefits to the Fund participants and beneficiaries, Field breached his fiduciary duty.

32. Under ERISA, "any person who is a fiduciary with respect to the plan who breaches any one of the responsibilities, obligations, or duties imposed upon fiduciaries" is personally liable "to make good to such plan any losses to the plan resulting from each such breach, and to restore the plan any profits of such fiduciary which have been made through the use of assets of the plan by the fiduciary..." 29 U.S.C. §1109(a).

7

33.     Field is personally liable for the portion of the principal contributions, as well as

interest and liquidated damages attributed thereto, due to the Health Plan, Pension Plan, Profit

Sharing Plan, and Apprentice Fund under ERISA, jointly and severally with the Defendant

Employer.

WHEREFORE, Plaintiffs ask that the Court:

> (1) Declare that Brendan Field is a fiduciary of the Health Plan, Pension Plan,
> Profit Sharing Plan, and Apprenticeship Fund by virtue of his exercise and
> control of plan assets and that Field be found in breach of his fiduciary duties;

> (2) Enter judgment against Field holding him liable, jointly and severally, with
> Defendant Employer for the portion of the principal delinquency due to the
> Health Plan, Pension Plan, Profit Sharing Plan, and Apprenticeship Fund, as
> well as the interest, liquidated damages and attorneys' fees and costs on said
> amounts as found to be owed by Defendant Employer in this matter; and

> (3) Grant any other further relief the court finds just and proper.

CLEARY, JOSEM & TRIGIANI LLP

BY:

WILLIAM T. JOSEM, ESQUIRE
JEREMY E. MEYER, ESQUIRE
Constitution Place
325 Chestnut Street, Suite 200
Philadelphia, PA 19106
(215) 735-9099
wtjosem@cjtlaw.org
jmeyer@cjtlaw.org

DATED:   April 1, 2019

# Exhibit A

## INSIDE COMMERCIAL AGREEMENT

Agreement by and between the Norristown Division, Penn-Del-Jersey chapter N.E.C.A. and Local Union No. 98 Zone 2, IBEW.

It shall apply to **ALL FIRMS** who sign a **LETTER OF ASSENT** to be bound by this Agreement.

As used hereinafter in this Agreement, the term "Chapter" shall mean the Norristown Division, Penn-Del-Jersey Chapter, N.E.C.A. and the term "Union" shall mean Local Union 98 Zone 2, IBEW.

The term "Employer" will mean an individual firm who has been recognized by an assent to this Agreement.

### BASIC PRINCIPLES

The Employer and the Union have common and sympathetic interest in the Electrical Industry. Therefore, a working system and harmonious relations are necessary to improve the relationship between the Employer, the Union and the Public. Progress in industry demands a mutuality of confidence between the Employer and the Union. All will benefit by continuous peace and by adjusting any difference by rational, common-sense methods. Now, therefore, in consideration of the mutual promises and Agreements herein contained, the parties hereto agree as follows:

## ARTICLE I
## STANDARD CIR
## EFFECTIVE DATE/ CHANGES/GRIEVANCES/DISPUTES

**EFFECTIVE DATE:**

**Section 1.01** This Agreement shall take effect April 30, 2017, and shall remain in effect until May 3, 2020, unless otherwise specifically provided for herein.  It shall continue in effect from year to year thereafter, from May 1st through April 20th of each year, unless changed or terminated in the way later provided herein.

**CHANGES:**

**Section 1.02**  (a) Either party or an Employer withdrawing representation from the Chapter or not represented by the Chapter, desiring to change or terminate this Agreement must provide written notification at least 90 days prior to the expiration date of the Agreement or any anniversary date occurring thereafter.

(b) Whenever notice is given for changes, the nature of the changes desired must be specified in the notice, or no later than the first negotiating meeting unless mutually agreed otherwise.

(c) The existing provisions of the Agreement, including this Article, shall remain in full force and effect until a conclusion is reached in the matter of proposed changes.

(d) Unresolved issues or disputes arising out of the failure to negotiate a renewal or modification of this agreement that remain on the 20th of the month preceding the next regular meeting of the Council on Industrial Relations for the Electrical Contracting Industry (CIR) may be submitted jointly or unilaterally to the Council for adjudication.  Such unresolved issues or disputes shall be submitted no later than the next regular meeting of the Council following the expiration date of this agreement or any subsequent anniversary date.  The Council's decisions shall be final and binding.

(e) When a case has been submitted to the Council, it shall be the responsibility of the negotiating committee to continue to meet weekly in an effort to reach a settlement on the local level prior to the meeting of the Council.

(f) Notice of a desire to terminate this Agreement shall be handled in the same manner as a proposed change.

**Section 1.03** This Agreement shall be subject to change or supplement at any time by mutual consent of the parties hereto. Any such change or supplement agreed upon shall be reduced to writing, signed by the parties hereto, and submitted to the International Office of the IBEW for approval, the same as this Agreement.

**Section 1.04** There shall be no stoppage of work either by strike or lockout because of any proposed changes in this Agreement or dispute over matters relating to this Agreement. All such matters must be handled as stated herein.

## GRIEVANCES/DISPUTES:

**Section 1.05** There shall be a Labor-Management Committee of three representing the Union and three representing the Employers. It shall meet regularly at such stated times as it may decide. However, it shall also meet within 48 hours when notice is given by either party. It shall select its own Chairman and Secretary. The Local Union shall select the Union representatives and the Chapter shall select the management representatives.

**Section 1.06** All grievances or questions in dispute shall be adjusted by the duly authorized representative of each of the parties to this Agreement. In the event that these two are unable to adjust any matter within 48 hours, they shall refer the same to the Labor-Management Committee.

**Section 1.07** All matters coming before the Labor-Management Committee shall be decided by a majority vote. Four members of the Committee, two from each of the parties hereto, shall be a quorum for the transaction of business, but each party shall have the right to cast the full vote of its membership and it shall be counted as though all were present and voting.

**Section 1.08** Should the Labor-Management Committee fail to agree or to adjust any matter, such shall then be referred to the Council on Industrial Relations for the Electrical Contracting Industry for adjudication. The Council's decisions shall be final and binding.

**Section 1.09** When any matter in dispute has been referred to conciliation or arbitration for adjustment, the provisions and conditions prevailing prior to the time such matters arose shall not be changed or abrogated until agreement has been reached or a ruling has been made.

## ARTICLE II
## EMPLOYER RIGHTS -- UNION RIGHTS

**Section 2.01** (a) Certain qualifications, knowledge, experience and proof of financial responsibility are required of everyone desiring to be an Employer in the Electrical Industry. Therefore, an Employer who contracts for electrical work is a person, firm or corporation having these qualifications and maintaining a place of business, a suitable financial status to meet payroll requirement.

(b) Each individual Employer will notify the Business Manager of the Union, on forms provided for that purpose, of each contract secured within the jurisdiction of the Union, as soon as possible after the award of such contract.

### MANAGEMENT RIGHTS:

**Section 2.02** The Union understands the Employer is responsible to perform the work required by the owner. The Employer shall, therefore, have no restrictions except those specifically provided for in the collective bargaining agreement, in planning, directing and controlling the operation of all his work, in deciding the number and kind of employees to properly perform the work, in hiring and laying off employees, in transferring employees from job to job within the Local Union's geographical jurisdiction, in determining the need and number as well as the person who will act as Foreman, in requiring all employees to observe the Employer's and/or owner's rules and regulations not inconsistent with this Agreement, in requiring all employees to observe all safety regulations, and in discharging employees for proper cause.

**Section 2.03** The Employer will have the right to call Foreman by name provided:

(a) The employee has not quit his previous Employer within the past two weeks.

(b) The Employer shall notify the Business Manager in writing of the name of the individual who is to be requested for employment as a Foreman. Upon such request, the Business Manager shall refer said Foreman provided the name appears on the highest priority group.

(c) When an employee is called as a Foreman, he must remain as a Foreman for 1,000 hours or must receive a reduction in force.

**WORKERS COMPENSATION INSURANCE:**

**Section 2.04**   For all employees covered by this Agreement, the Employer will carry Workers' Compensation Insurance, with a company authorized to do business in this State, Social Security, and such other protective insurance as may be required by the laws of the State in which the work is performed.  He will also make voluntary contributions to the State Unemployment Compensation Commission regardless of the number of employees.

**SURETY BOND:**

**Section 2.05**   (a) In the event of any Employer giving an uncollectible check, no further work will be performed until the sum involved has been made good, together with all added costs, and the Employer has deposited in escrow the sum of $15,000.00, which sum will be payable to the employees and/or fund, in the event of any further default.  Such sum will remain in escrow as long as the Union may require.

(b) Should any such Employer thereafter fail to pay when due, the bond that has been posted as provided in this Section will be used by the escrow agent to pay wages and/or delinquent fund payments.  After a period of one year, in the event the Employer has not again defaulted in the payment of wages, the bond will be returned to him.

(c)The minimum bond required shall be no less than $50,000.  This bond amount shall be for employers in the Local 98 Zone 2 jurisdiction employing 5 or less employees *(that qualify) on which benefits are being paid into the funds.  Said employers must remain current with their benefit payments each month.  Delinquency may cause a higher bond level requirement.

> 6 to 12 employees......... $100,000.00 bond
>
> 13 to 25 employees.........$200,000.00 bond
>
> 26 to 40 employees......... $300,000.00 bond
>
> 41 to 50 employees......... $400,000.00 bond

Over 50 employees, $100,000.00 per each additional 10 employees up to 100 employees.  Over 100 employees, a Labor/Management committee shall determine the bond amount.

In lieu of a bond, the employer may deposit in cash, the equivalent of the bond amount in a designated depository. Local Union 98 Zone 2, IBEW, shall be designated the recipient of any monies dispensed by the surety or depository for the payment of wages and allocations of monies to the various funds. Such bond or cash account is to ensure compliance with the payment of monies due as wages to employees and monies due the various funds to which the employer is obligated to contribute under the terms of this Agreement, and for all costs incurred in collecting said monies. (No additional manpower will be supplied to a contractor in a delinquent status).

The Bond will not be terminated until (120) days after the completion of said job unless sooner permitted by Local Union 98 Zone 2, IBEW. Any default by any Employer failing to submit the monies and reports, as required under Article VI of the Agreement, will be subject to all penalties as outlined in the Agreement

## JOINT-VENTURE:

**Section 2.06**   Employers engaged in joint venture jobs will be considered as a new and separate individual Employer, with all rights herein as apply to an individual participating Employer. There shall be no transfer of workers between a joint-venture and any or all of the Employers comprising the joint-venture.

## UNION RECOGNITION:

**Section 2.07**   (a) The Employer recognizes the Union as the sole and exclusive representative of all its employees performing work within the jurisdiction of the Union for the purpose of collective bargaining in respect to rates of pay, wages, hours of employment and other conditions of employment.

b) The Employer understands that the Local Union's jurisdiction—both trade and territorial—is not a subject for negotiations, but rather is determined solely within the I.B.E.W. by the International President and, therefore agrees to recognize and be bound by such determinations.

## WORK PRESERVATION:

**Section 2.08**   (a) In order to protect and preserve, for the employees covered by this Agreement, all work heretofore performed by them, and in order to prevent any device or subterfuge to avoid the protection and preservation of such work, it is hereby agreed as follows: If and when the Employer shall perform any on-site construction work of the type covered by this Agreement, under its own name or under the name of another, as a corporation, company, partnership, or any other business entity including a joint venture, wherein the Employer, through its

Page 6 of 43

officers, directors, partners or stockholders, exercises either directly or indirectly, management control or majority ownership, the terms and conditions of this Agreement shall be applicable to all such work. All charges or violations of this Section shall be considered as a dispute and shall be processed in accordance with the provisions of this Agreement covering the procedure for the handling of grievances and the final and binding resolution of disputes.

(b) As a remedy for violations of this Section, the Labor-Management Committee, the Council on Industrial Relations for the Electrical Contracting Industry, and/or an independent arbitrator, as the case may be, are empowered, in their discretion and at the request of the Union, to require an Employer to (1) pay to affected employees covered by this Agreement, including registered applicants for employment, the equivalent of wages lost by such employees as a result of the violations; and (2) pay into the affected joint trust funds established under this Agreement any delinquent contributions to such funds which have resulted from the violations. Provisions for this remedy herein does not make such remedy the exclusive remedy available to the Union for violation of this Section nor does it make the same or other remedies unavailable to the Union for violations of other Sections or Articles of this Agreement.

(c) If, as a result of violations of this Section, it is necessary for the Union and/or the Trustees of the joint trust funds to institute court action to enforce an award rendered in accordance with subsection (b) above, or to defend an action which seeks to vacate such award, the Employer shall pay any accountants' and attorneys' fees incurred by the Union and/or Fund Trustees, plus cost of the litigation, which have resulted from the bringing of such court action.

## NON-RESIDENT EMPLOYEES: *(Portability)*

**Section 2.09** An Employer signatory to a collective bargaining agreement or to a letter of assent to an agreement with another IBEW Local Union, who signs an assent to this Agreement, may bring up to four bargaining unit employees employed in that Local Union's jurisdiction into this Local's jurisdiction and up to two bargaining unit employees per job from that Local's jurisdiction to this Local's jurisdiction for specialty or service and maintenance work. All charges of violations of this section shall be considered as a dispute and shall be processed in accordance with the provisions of this agreement for the handling of grievances with the exception that any decision of a local labor-management committee that may be contrary to the intent of the parties to the National Agreement on Employee Portability, upon recommendation of either or both

the appropriate IBEW International Vice President or NECA Regional Executive Director, is subject to review, modification, or rescission by the Council on Industrial Relations. When additional journeymen are needed, they will be referred from the Local Union Office. The first person referred will be the foreman and will be paid the appropriate wage rate.

FAVORED NATIONS: *Note: The IBEW recommends that this language be omitted from all agreements with independent employers.*

**Section 2.10** The Union agrees that if, during the life of this Agreement, it grants to any other Employer in the Electrical Contracting Industry on work covered by this Agreement, any better terms or conditions than those set forth in this Agreement, such better terms or conditions shall be made available to the Employer under this Agreement and the Union shall immediately notify the Employer of any such concession.

**Section 2.11** No individual connected with an employing concern as owner, manager, superintendent, or partner will perform any manual electrical work, unless cleared by the Business Manager.

**Section 2.12** Employers shall not loan their employees to another employer without first securing the permission of the Business Manager and then only when applicants possessing the required skills are not available through the Referral Procedure.

**Section 2.13** No applicant or employee, while he remains subject to employment by Employers operating under this agreement will be recognized as a contractor for the performance of any electrical work.

**Section 2.14** Journeymen Wiremen will install all electrical work in a safe and workmanlike manner and in accordance with applicable code and contract specifications. No Employer will direct any workman to violate this section nor will any workman be discriminated against for observing it.

**Section 2.15** A Journeyman Wireman will be required to make corrections on improper workmanship, for which he is responsible, on his own time and during regular working hours unless errors were made by orders of the Employer, or the Employer's representative.

**UNION RIGHT TO DISCIPLINE MEMBERS:**

**Section 2.16** The Union reserves the right to discipline its members for violation of its laws, rules and agreements.

**APPOINTMENT OF STEWARDS:**

**Section 2.17**   (a) The Union has the right to appoint Stewards at any shop and/or job where workers are employed under the terms of this Agreement. It will be the duty of such Steward to see that the terms and conditions of this Agreement are observed in his shop or on the job. Under no circumstances will any Employer discriminate against a Steward be cause of his faithful performance of duties as such.

(b) The steward will not be considered for termination from a project until the project has a reduction of manpower below five (5) people to remain on the job. This reduction will only include Journeymen Wiremen.

**UNION JOB ACCESS:**

**Section 2.18**   A Representative of the Union will be allowed access to any shop or job, at any reasonable time, where workmen are employed under the terms of this Agreement.

**PICKET LANGUAGE:**

**Section 2.19**   (a) It shall not be a violation of this Agreement, and it will not be cause for discharge or any other disciplinary action by the Employer against any employee, for an employee to refuse to cross a lawfully established primary picket line, whether at the premises of another Employer or the employee's own Employer.

(b) Any employee exercising such right will carefully put away all tools, materials, equipment, or any other property of the Employer in a safe manner. Each employee will be responsible for any loss to the Employer for neglect in carrying out this provision but only when a safe place is provided by the Employer.

**Section 2.20**   There shall be no limit on production of workmen or restriction on the safe use of proper tools, or equipment, and there shall be no taskwork or piece work.

**TOOL LIST:**

**Section 2.21** Journeymen Wiremen shall provide themselves with a standard conventional kit of tools necessary to perform their classification of work with the following tools:

| | |
|---|---|
| Knife | 9" Side Cutter Pliers |
| Plumb Bob | 2 Pr. Channel lock Pliers |
| Center Punch | Tool Box, Bag or Pouch |
| Six Foot Rule or Tape | Long Nose Pliers |
| Hacksaw Frame | 600 Volt Voltage Tester |
| Diagonal Pliers | Large & Small Adjustable Wrenches |
| Set Straight Blade Screwdrivers | Flashlight (No Batteries) |
| Set Phillips Screwdrivers | Work Gloves |
| Pencil | Awl |
| Pocket Level | Set Allen Wrenches |
| Small & Large Chisel | Keyhole Saw |
| Hammer | Chalk Line |
| Combination Square | Adjustable Tap Stock |

NOTE: ALL OTHER HAND TOOLS TO BE OPTIONAL

**Section 2.22** (a) The Employer shall furnish all other necessary tools or equipment. This will include, but not limited to, all power tools and all associated equipment, etc. Workers will be held responsible for the tools or equipment issued to them providing the Employer furnishes the necessary lockers, tool boxes, or other safe place of storage. Tools must be taken out and put away during working hours.

(b) The Employer will provide a suitable place on all jobs for the keeping or storage of employee's clothing and tools and he will be held responsible for loss of these by fire or theft.

**UNION SECURITY:**

**Section 2.23** All employees covered by the terms of this Agreement will be required to become and remain members of the Union as a condition of employment from and after the 30th day following the date of their employment or the effective date of this agreement, whichever is later.

**AGE-RATIO:**

**Section 2.24** On all jobs requiring five (5) or more Journeymen, at least every fifth Journeyman, if available, shall be fifty (50) years of age or older.

**ANNULMENT/SUBCONTRACTING:**

**Section 2.25**   The Local Union is a part of the International Brotherhood of Electrical Workers and any violation or annulment by an individual Employer of the approved Agreement of this or any other Local Union of the IBEW, other than violations of Paragraph 2 of this Section, will be sufficient cause for the cancellation of his Agreement by the Local Union after a finding has been made by the International President of the Union that such a violation or annulment has occurred.

The subletting, assigning, or transfer by an individual Employer of any work in connection with electrical work to any person, firm or corporation not recognizing the IBEW or one of its Local Unions as the collective bargaining representative of his employees on any electrical work in the jurisdiction of this or any other Local Union to be performed at the site of the construction, alteration, painting or repair of a building, structure or other work, will be deemed a material breach of this Agreement.

All charges of violations of Paragraph 2 of this Section shall be considered as a dispute and shall be processed in accordance with the provision of this Agreement covering the procedure for the handling of grievances and the final and binding resolution of disputes.

## ARTICLE III
## HOURS/WAGES/WORKING CONDITIONS

**HOURS/WAGES:**

Section 3.01 (a) Eight hours shall be the daily working period, starting between the hours of 7:00 A.M. and 8:00 A.M., with a thirty minute lunch period. All hours worked during the daily working period are paid at normal rates.

(b) Five days shall be the regular work week, Mondays to Fridays, inclusive. The work week starts between the hours of 7:00 A.M. and 8:00 A.M. Monday.

**OVERTIME, HOLIDAYS:**

Section 3.02 (a) Work performed on New Year's, Memorial, Independence, Labor, Thanksgiving, and Christmas Day shall be paid for at rates double those stated in Section 3.04(a). Holidays falling on a Sunday will be celebrated on Monday.

(b) Election Day shall be included and subject to the terms of Section 3.02 when notification has been given by either party to the Labor Management Committee. The Labor Management Committee will notify the employers and members of the Union in a timely manner and in any case, no less than one week in advance. Four - 10 hour days may be worked in exchange for Election Day.

(c) Hours worked, either prior to, or after the daily working period, Monday through Friday shall be paid at one and one-half (1-1/2) times the hourly rate*. All hours worked on Saturdays shall be paid at one and one-half (1-1/2) times the hourly rate*. All hours worked on Sundays and holidays shall be paid at two (2) times the hourly rate*, until 7:00 AM on Monday Morning. Shifts may begin on a Sunday at shift rates.

(d) Unless a continuous eight hour rest period is provided after overtime stops, overtime rates shall apply to all time worked after overtime starts, except as provided for in paragraph (e) of this Section.

(e) If a man works past midnight, the eight (8) hour rest period shall not be required on a one (1)-time basis for the duration of the job.

(f) Overtime will be allowed to be worked for tie-ins, cut-overs, emergency shutdowns, and repairs when specifically called for by the project documents and, the Business Manager will be notified of all such overtime. All other overtime must be cleared by the Business Manager.

**PAYDAY:**

**Section 3.03**   Wages shall be paid weekly in cash or by payroll check on a local bank no later than quitting time on Friday and not more than three days' wages may be withheld at that time. Direct Deposit shall be optional providing there is a mutual agreement between the employer and employee.  Any worker laid off or discharged will be paid his/her wages immediately.  In the event the worker is not paid off, as provided above, waiting time at the appropriate rate will be charged until payment is made.  The Employer will either pay the worker at the job site during regular working hours or allow sufficient time during regular working hours to report to the shop to receive payment.

**Section 3.04**   The minimum hourly rate of wages will be as follows:

> (a) Effective 12:01 A.M. August 30, 2015, and to remain in effect until April 29, 2017, both inclusive, the following Journeyman Wireman wage per hour will apply:
>
> Journeyman Wireman $42.27/hr.
>
> Effective 8/30/15, the following Foreman Rates will apply:
>
> Sub-Foreman
>     -Six Percent (6%) above Journeyman Wireman's Rate
>
> Small Job Foreman (Up to 3 men)
>     -Seven Percent (7%) above Journeyman Wireman's Rate
>
> Large Job Foreman (Up to 10 men)
>     -Ten Percent (10%) above Journeyman Wireman's Rate
>
> General Foreman (11 to 25 men)
>     -Ten Percent (10%) above Journeyman Wireman's Rate
>
> General Foremen (26 to 39 men)
>     -Twelve Percent (12%) above Journeyman Wireman's Rate
>
> General Foreman (40 or more men)
>     -Fifteen Percent (15%) above Journeyman Wireman's Rate
>
> Apprentice Wage Rates, effective 8/30/15.

**APPRENTICE WIREMAN - TEN (10) PERIODS***

| | |
|---|---|
| 1ST PERIOD | 35% of JOURNEYMAN WIREMAN RATE |
| 2ND PERIOD | 35% of JOURNEYMAN WIREMAN RATE |
| 3RD PERIOD | 40% of JOURNEYMAN WIREMAN RATE |
| 4TH PERIOD | 45% of JOURNEYMAN WIREMAN RATE |
| 5TH PERIOD | 50% of JOURNEYMAN WIREMAN RATE |
| 6TH PERIOD | 55% of JOURNEYMAN WIREMAN RATE |
| 7TH PERIOD | 60% of JOURNEYMAN WIREMAN RATE |
| 8TH PERIOD | 65% of JOURNEYMAN WIREMAN RATE |
| 9TH PERIOD | 75% of JOURNEYMAN WIREMAN RATE |
| 10TH PERIOD | 80% of JOURNEYMAN WIREMAN RATE |

*Applies to Apprentices accepted into the program PRIOR to September 1, 2015.*

**APPRENTICE WIREMAN - SIX (6) PERIODS***

| | |
|---|---|
| 1ST PERIOD | 30% of JOURNEYMAN WIREMAN RATE |
| 2ND PERIOD | 35% of JOURNEYMAN WIREMAN RATE |
| 3RD PERIOD | 40% of JOURNEYMAN WIREMAN RATE |
| 4TH PERIOD | 50% of JOURNEYMAN WIREMAN RATE |
| 5TH PERIOD | 60% of JOURNEYMAN WIREMAN RATE |
| 6TH PERIOD | 75% of JOURNEYMAN WIREMAN RATE |

*Applies to NEW APPRENTICES as of September 1, 2015*

Page 14 of 43

**TRAVEL TIME:**

**Section 3.05** (a) No traveling time will be paid before or after working hours for traveling to or from any job in the jurisdiction of the Union when workmen are ordered to report on the job.

(b) The employer shall pay time for travel and furnish transportation from shop to job, job to job, and job to shop within the jurisdiction of the Union. On work outside the jurisdiction of the Union, the Employer shall furnish transportation, traveling time, room and board and all other necessary expenses.

**Section 3.06** (a) When the employee is required to report to a job and required to change job during regular working hours, the Employer will pay for traveling time and furnish transportation.

(b) No worker shall use any automobile, motorcycle or other vehicle in a manner considered to be unfair to other workers, or against the best interest of the Union.

(c) Whenever an employee will use their personal automobile/truck for transportation purposes in lieu of transportation furnished by the Employer, they will be reimbursed for such use at the rate per mile that is allowable by the IRS code.

**UNION DUES DEDUCTION:**

**Section 3.07** The Employer agrees to deduct and forward to the Financial Secretary of the Local Union upon receipt of a voluntary written authorization the additional working dues from the pay of each IBEW member. The amount to be deducted shall be the amount specified in the approved Local Union Bylaws. Such amount shall be certified to the Employer by the Local Union upon request by the Employer.

**Section 3.08** On each job where up to three (3) Journeymen are employed, one of them will be designated as SMALL JOB FOREMAN. On each job where four to ten (inclusive) Journeymen are employed, one of them will be designated as LARGE JOB FOREMAN. On each job where eleven to twenty-five men are employed, one of them will be designated as SMALL JOB GENERAL FOREMAN. On each job where twenty-six to thirty-nine men are employed, one of them will be designated as MEDIUM JOB GENERAL FOREMAN. One each job where forty or more men are employed, one of them will be designated as LARGE JOB GENERAL FOREMAN. On each job where twelve or more Journeymen are employed, one of them will be designated as GENERAL FOREMAN, and one of them will be designated as SUB-FOREMAN. For each eleven additional Journeymen (or major fraction thereof) above the first twelve employed on a job, an additional SUB-FOREMAN will be designated.

After this rate is established for the job, it will not be decreased below the next classification, and this rate will be maintained for at least 65 regular working days.

**SHOW-UP PAY:**

**Section 3.09** (a) When workers report at the shop or job and are not put to work due to conditions beyond the control of the workers, they shall receive two hours' pay. Workers may be required to remain on the job site for the hours paid.

(b) When workers report and are put to work they will receive pay for a minimum of four hours and will remain on the job unless directed otherwise by the Employer.

(c) When work is unable to be scheduled between the hours of 7:00 A.M. to 4:30 P.M. due to plant operation, the work may be performed after the hour of 4:30 P.M. This work will then be compensated based on the majority of hours worked in a given shift (second or third shift). Equal hours constitute third shift percentage compensation. This work will be based on eight (8) hours worked with not more than (30) thirty minutes for a lunch period. All overtime will be subject to overtime regulations as stated in Section 3.02.

**SHIFT WORK:**

**Section 3.10** (a) When so elected by the contractor, multiple shifts of eight (8) hours for at least five (5) days duration maybe worked. When two (2) or three (3) shifts are worked:

(b) The first shift (day shift) shall consist of eight (8) consecutive hours worked between the hours of 7:00 A.M. and 3:30 P.M. Workmen on the "day shift" shall be paid at the regular hourly rate of pay for all hours worked.

(c) The second shift (swing shift) shall consist of eight (8) consecutive hours worked between the hours of 3:30 P.M. and 12:00 A.M. Workmen on the "swing shift" shall be paid at the regular hourly rate of pay plus 10% for all hours worked.

(d) The third shift (graveyard shift) shall consist of eight (8) consecutive hours worked between the hours of 11:30 P.M. and 8:00 A.M. Workmen on the "graveyard shift" shall be paid at the regular hourly rate of pay plus 15% for all hours worked.

(e) The employer shall be permitted to adjust the starting hours of the shift by up to two (2) hours in order to meet the needs of the customer.

(f) If the parties to the Agreement mutually agree, the shift week may commence with the third shift (graveyard) at 12:30 A.M. Monday to coordinate the work with the customer's work schedule. However, any such adjustment shall last for at least five (5) consecutive days' duration unless mutually changed by the parties to this Agreement.

(g) An unpaid lunch period of thirty (30) minutes shall be allowed on each shift. All overtime work required before the established start time and after the completion of eight (8) hours of any shift shall be paid at one and one-half times the "shift" hourly rate.

(h) There shall be no pyramiding of overtime rates and double the straight rate shall be the maximum compensation for any hour worked. There shall be no requirement for a day shift when either the second or third shift is worked.

**Section 3.11**   (a) The pulling of all wire and cable will be done by hand, by manually operated winches or by such power equipment as is within the jurisdiction of the IBEW.

(b) Where an Employer maintains a storeroom and a worker is required to be present at all times, such work will be performed by a worker employed under the terms of this Agreement.

**Section 3.12**   Employees required to work outside in rainy weather (only in case of emergency) will be furnished rain gear by the Employer. The Employer's job headquarters on every project must have a completely equipped Class A First Aid Kit at all times.

**Section 3.13**   There shall be no restrictions on the use of catalog items. This does not preclude the performance of electrical work by bargaining unit persons in an Employer's shop facility under the terms of this Agreement.

**Section 3.14**   The Employer will notify the Union 48 hours in advance of any layoff, whenever possible, and Saturdays, Sundays and holidays are not included.

**Section 3.15**   CREDIT UNION

The parties hereto agree to deduct an amount equal to $1.75 per hour worked *(Exception - No deduction from the wages of the first year & second year indentured apprentice who is in his/her probationary period)* and to forward to the Local Union No.

98 Zone 2, IBEW Administrator, who will forward it to the Local Union No. 380, IBEW, Credit Union. All employees not being members of the Credit Union will be refunded their moneys upon a written request as furnished by the Credit Union. All monies to be due on the fifteenth (15) day of the following month from which deductions have been made. Authorization card must be signed for Credit Union deductions.

**Section 3.16** The parties agree that, with respect to all working dues deductions and all other amounts withheld from wages that are payable to the Union, as well as Credit Union contributions and COPE Fund contributions under Sections 3.08 (Dues), 3.17 (Credit Union) and 3.18 (COPE Fund) of this Agreement and any other amounts that, in accordance with this Agreement, an Employer withholds from the wages of employees for submission to the Union and/or any Fund identified herein, such amounts shall not, under any circumstances, be construed as the property of the Employer or co-mingled with the Employer's assets. All such amounts, having been withheld from employees' wages, are hereby impressed with a "Trust" and shall be held by the Employer only pending timely transmission of such amounts to the Union and/or Fund, as the case may be. An Employer who has withheld or deducted such amounts under any provision set forth in this Agreement is prohibited from using such amounts for its own purposes or for the benefit of any other person.

## ARTICLE IV
## REFERRAL PROCEDURE

**Section 4.01** In the interest of maintaining an efficient system of production in the Industry, providing for an orderly procedure of referral of applicants for employment, preserving the legitimate interest of the employees in their employment status within the area and of eliminating discrimination in employment because of membership or non-membership in the Union, the parties hereto agree to the following system of referral of applicants for employment.

**Section 4.02** The Union shall be the sole and exclusive source of referral of applicants for employment.

**Section 4.03** The Employer shall have the right to reject any applicant for employment.

**Section 4.04** The Union shall select and refer applicants for employment without discrimination against such applicants by reason of membership or non-membership in the Union and such selection and referral shall not be affected in any way by rules, regulations, bylaws, constitutional provisions or any other aspect or obligation of Union membership policies or requirements. All such selection and referral shall be in accord with the following procedure.

**Section 4.05**   The Union shall maintain a register of applicants for employment established on the basis of the Groups listed below.   Each applicant for employment shall be registered in the highest priority Group for which he qualifies.

### JOURNEYMAN WIREMAN - - JOURNEYMAN TECHNICIAN

**GROUP I**     All applicants for employment who have four or more years' experience in the trade, are residents of the geographical area constituting the normal construction labor market, have passed a Journeyman Wireman's examination given by a duly constituted Inside Construction Local Union of the I.B.E.W. or have been certified as a Journeyman Wireman by any Inside Joint Apprenticeship and Training Committee, and, who have been employed in the trade for a period of at least one year in the last four years in the geographical area covered by the collective bargaining agreement.

Group I Status shall be limited to one Local Union at one time.   An applicant who qualifies for Group I in a local union shall be so registered electronically and remain on Group I in that local union unless and until the applicant designates another local union as his or her Group I local union.   If an applicant qualifies for Group I status in a local union other than his or her home local union and designates that local as his or her Group I local union, the business manager of the new Group I status local union shall by electronic means notify the business manager of the applicant's former Group I status local union.

**GROUP II**     All applicants for employment who have four or more years' experience in the trade and who have passed a Journeyman Wireman's examination given by a duly constituted Inside Construction Local Union of the I.B.E.W. or have been certified as a Journeyman Wireman by any Inside Joint Apprenticeship and Training Committee.

**GROUP III**     All applicants for employment, who have two or more years' experience in the trade, are residents of the geographical area constituting the normal construction labor market, and who have been employed for at least six months in the last three years in the geographical area covered by the collective bargaining agreement.

**GROUP IV**     All applicants for employment who have worked at the trade for more than one year.

**Section 4.06**   If the registration list is exhausted and the Local Union is unable to refer applicants for employment to the Employer within 48 hours from the time of receiving the Employer's request, Saturdays, Sundays and holidays excepted, the Employer shall be free to secure applicants without using the Referral Procedure but such applicants, if hired, shall have the status of "temporary employees".

**Section 4.07**   The Employer shall notify the Business Manager promptly of the names and Social Security numbers of such "temporary employees" and shall replace such

"temporary employees" as soon as registered applicants for employment are available under the Referral Procedure.

**Section 4.08**   "Normal construction labor market" is defined to mean the following geographical area plus the commuting distance adjacent thereto which includes the area from which the normal labor supply is secured:

IN THE STATE OF PENNSYLVANIA

**Bucks County:**    Hilltown and New Britain Townships in their entirety; that portion of Telford Borough northeast of County Line Road (Main Street) and bounded by West Rockhill and Hilltown Townships; that portion of Dublin Borough west of State Highway 313, and that portion of Doylestown and Warrington Townships and Doylestown Borough northwest of a line following U.S. Highway 611 south from Route 09064 to the spur of Route 270, and proceeding northwest along the spur to Route 397, southwest on 397 to Route 350, southeast on 350 to 395, southwest on 395 to Route 09069, southeast on 09069 to Route 09041, southwest on 09041 to the Montgomery County Line.

**Chester County:**    East Coventry, East Vincent, West Vincent, East Pikeland, West Pikeland, Uwchlan, Upper Uwchlan, East Brandywine, Schuylkill and Charlestown Townships in their entirety, and that portion of Caln, East Caln, West Whiteland, East Whiteland, Tredyffrin, Willistown, and Easttown Townships and the Borough of Downingtown north of U. S. Highway 30.

**Delaware County:**    That portion of Radnor Township north of the U.S. Highway 30 and west of State Highway 320.

**Montgomery County:** That portion northwest of a line following Lower State Road from Bucks County southwest to the Bethlehem Pike (U.S. Highway 309), south on Bethlehem Pike to the Penllyn Pike,  southwest on the Penllyn and Blue Bell Pikes to the Wissahickon Creek, southeast on the Wissahickon Creek to the Butler Pike, southwest on the Butler Pike to North Lane near Conshohocken Borough, southeast on North Lane to the Schuylkill River and continuing southeast in a line to the Spring Mill Road, southwest on the Spring Mill Road to Delaware County; but excluding Upper Hanover, Douglas, Upper Pottsgrove, West Pottsgrove Townships and also excluding that portion of the Borough of Pottstown north and west of a line drawn Northeast on Keim Street from the Schuylkill River to the Reading Railroad, northwest on the railroad

> to Madison Street, north on Madison Street to High Street, east on High Street to Green Street, north on Green Street and northeast on Mintzer Street to the Lower Pottsgrove Township Line, along this township line and the borough line northwest to Adams Street and the Beehive Road, northeast on the Beehive Road to the Township Line at Mervine Street in the State of Pennsylvania.

The above geographical area is agreed upon by the parties to include the area defined by the Secretary of Labor to be the appropriate prevailing wage area under the Davis-Bacon Act to which the Agreement applies.

**Section 4.09** "Resident" means a person who has maintained his permanent home in the above defined geographical area for a period of not less than one year or who, having had a permanent home in this area, has temporarily left with the intention of returning to this area as his permanent home.

**Section 4.10** An "Examination" shall include experience rating tests if such examination shall have been given prior to the date of this procedure, but from and after the date of this procedure, shall include only written and/or practical examinations given by a duly constituted Inside Construction Local Union of the I.B.E.W. Reasonable intervals of time for examinations are specified as ninety (90) days. An applicant shall be eligible for examination if he has four years' experience in the trade.

**Section 4.11** The Union shall maintain an "Available for Work List" which shall list the applicants within each Group in chronological order of the dates they register their availability for employment.

**Section 4.12** An applicant who has registered on the "Available for Work List" must renew his application every thirty days or his name will be removed from the List.

**Section 4.13** An applicant who is hired and who receives, through no fault of his own, work of forty hours or less shall, upon re-registration, be restored to his appropriate place within his Group.

**Section 4.14** (a) Employers shall advise the Business Manager of the Local Union of the number of applicants needed. The Business Manager shall refer applicants to the Employer by first referring applicants in Group I in the order of their place on the "Available for Work List" and then referring applicants in the same manner successively from the "Available for Work List" in Group II, then Group III, and then Group IV. Any applicant who is rejected by the Employer shall be returned to his appropriate place within his Group and shall be referred to other employment in accordance with the position of his Group and his place within his Group.

**REPEATED DISCHARGE:**

**Section 4.14** (b) An applicant who is discharged for cause two times within a 12-month period shall be referred to the neutral member of the Appeals Committee for a determination as to the applicant's continued eligibility for referral. The neutral member of the Appeals Committee shall, within three* business days, review the qualifications of the applicant and the reasons for the discharges. The neutral member of the Appeals Committee may, in his or her sole discretion: (1) require the applicant to obtain further training from the JATC before again being eligible for referral; (2) disqualify the applicant for referral for a period of four weeks, or longer, depending on the seriousness of the conduct and/or repetitive nature of the conduct; (3) refer the applicant to an employee assistance program, if available, for evaluation and recommended action; or (4) restore the applicant to his/her appropriate place on the referral list. *The parties may extend this time period up to a maximum of two weeks if necessary.* (Note: Italicized is optional and must be negotiated locally.)
**Section 4.15** The only exceptions which shall be allowed in this order of referral are as follows:

> (a) When the Employer states bona fide requirements for special skills and abilities in his request for applicants, the Business Manager shall refer the first applicant on the register possessing such skills and abilities.

> (b)The age ratio clause in the Agreement calls for the employment of an additional employee or employees on the basis of age. Therefore, the Business Manager shall refer the first applicant on the register satisfying the applicable age requirements provided, however, that all names in higher priority Groups, if any, shall first be exhausted before such overage reference can be made.

**Section 4.16** An Appeals Committee is hereby established composed of one member appointed by the Union, one member appointed by the Employer or the Association, as the case may be, and a Public Member appointed by both these members.

**Section 4.17** It shall be the function of the Appeals Committee to consider any complaint of any employee or applicant for employment arising out of the administration by the Local Union of Sections 4.04 through 4.15 of the Agreement. The Appeals Committee shall have the power to make a final and binding decision on any such complaint which shall be complied with by the Local Union. The Appeals Committee is authorized to issue procedural rules for the conduct of its business but it is not authorized to add to, subtract from, or modify any of the provisions of this Agreement and its decisions shall be in accord with this Agreement.

**Section 4.18** A representative of the Employer or of the Association, as the case may be, designated to the Union in writing, shall be permitted to inspect the Referral Procedure records at any time during normal business hours.

**Section 4.19**   A copy of the Referral Procedure set forth in this Agreement shall be posted on the Bulletin Board in the offices of the Local Union and in the offices of the Employers who are parties to this Agreement.

**Section 4.20**   Apprentices shall be hired and transferred in accordance with the Apprenticeship provisions of the Agreement between the parties.

### REVERSE LAYOFF:

**Section 4.21**   When making reductions in the number of employees due to lack of work, Employers shall use the following procedure:

> (a) Temporary employees, if any are employed, shall be laid off first. Then employees in Group IV shall be laid off next, if any are employed in this Group.  Next to be laid off are employees in Group III, if any are employed in this group, then those in Group II, and then those in Group I.

> (b) Paragraph (a) will not apply as long as the special skills requirement as provided for in  Section 4.15(a) is required.

> (c) Supervisory employees covered by the terms of this Agreement will be excluded from layoff as long as they remain in a supervisory capacity. When they are reduced to the status of Journeyman, they will be slotted in the appropriate group in paragraph (a) above.

## ARTICLE V
### STANDARD INSIDE APPRENTICESHIP & TRAINING LANGUAGE

**Section 5.01** There shall be a local Joint Apprenticeship and Training Committee (JATC) consisting of a total of either 6 or 8 members who shall also serve as Trustees to the local apprenticeship and training trust. An equal number of members (either 3 or 4) shall be appointed, in writing, by the local chapter of the National Electrical Contractors Association (NECA) and the local union of the International Brotherhood of Electrical Workers (IBEW).

The local apprenticeship standards shall be in conformance with national guideline standards and industry policies to ensure that each apprentice has satisfactorily completed the NJATC required hours and course of study. All apprenticeship standards shall be registered with the NJATC before being submitted to the appropriate registration agency.

The JATC shall be responsible for the training of apprentices, journeymen, installers, technicians, and all others (unindentured, intermediate journeymen, etc.)

**Section 5.02** All JATC member appointments, re-appointments and acceptance of appointments shall be in writing. Each member shall be appointed for a 3 year term, unless being appointed for a lesser period of time to complete an unexpired term. The terms shall be staggered, with one (1) term from each side expiring each year. JATC members shall complete their appointed term unless removed for cause by the party they represent or they voluntarily resign. All vacancies shall be filled immediately.

The JATC shall select from its membership, but not both from the same party, a Chairman and a Secretary who shall retain voting privileges. The JATC will maintain one (1) set of minutes for JATC committee meetings and a separate set of minutes for Trust meetings.

The JATC should meet on a monthly basis, and also upon the call of the Chairman.

**Section 5.03** Any issue concerning an apprentice or an apprenticeship matter shall be referred to the JATC for its review, evaluation, and resolve; as per standards and policies. If the JATC deadlocks on any issue, the matter shall be referred to the Labor-Management Committee for resolution as outlined in Article I of this agreement; except for trust fund matters, which shall be resolved as stipulated in the local trust instrument.

**Section 5.04** There shall be only one (1) JATC and one (1) local apprenticeship and training trust. The JATC may, however, establish joint subcommittees to meet specific needs, such as residential or telecommunication apprenticeship. The JATC may also

establish a subcommittee to oversee an apprenticeship program within a specified area of the jurisdiction covered by this agreement.

All subcommittee members shall be appointed, in writing, by the party they represent. A subcommittee member may or may not be a member of the JATC.

**Section 5.05** The JATC may select and employ a part-time or a full-time Training Director and other support staff, as it deems necessary. In considering the qualification, duties, and responsibilities of the Training Director, the JATC should review the Training Director's Job Description provided by the NJATC. All employees of the JATC shall serve at the pleasure and discretion of the JATC.

**Section 5.06** To help ensure diversity of training, provide reasonable continuous employment opportunities, and comply with apprenticeship rules and regulations, the JATC, as the program sponsor, shall have full authority for issuing all job training assignments and for transferring apprentices from one employer to another. The employer shall cooperate in providing apprentices with needed work experiences. The local union referral office shall be notified, in writing, of all job training assignments. If the employer is unable to provide reasonable continuous employment for apprentices, the JATC is to be so notified.

**Section 5.07** All apprentices shall enter the program through the JATC as provided for in the registered apprenticeship standards and selection procedures.
An apprentice may have their indenture canceled by the JATC at any time prior to completion as stipulated in the registered standards. Time worked and accumulated in apprenticeship shall not be considered for local union referral purposes until the apprentice has satisfied all conditions of apprenticeship. Individuals terminated from apprenticeship shall not be assigned to any job in any classification, or participate in any related training, unless they are reinstated in apprenticeship as per the standards, or they qualify through means other than apprenticeship, at some time in the future, but no sooner than two years after their class has completed apprenticeship, and they have gained related knowledge and job skills to warrant such classification.

**Section 5.08** The JATC shall select and indenture a sufficient number of apprentices to meet local manpower needs. The JATC is authorized to indenture the number of apprentices necessary to meet the job site ratio as per Section 5.12.

**Section 5.09** Though the JATC cannot guarantee any number of apprentices; if a qualified employer requests an apprentice, the JATC shall make every effort to honor the request. If unable to fill the request within ten (10) working days, the JATC shall select and indenture the next available person from the active list of qualified applicants. An active list of qualified applicants shall be maintained by the JATC as per the selection procedures.

**Section 5.10**   To accommodate short-term needs when apprentices are unavailable, the JATC shall assign unindentured workers who meet the basic qualification for apprenticeship.  Unindentured workers shall not remain employed if apprentices become available for OJT assignment.  Unindentured workers shall be used to meet job site ratios except on wage and hour (prevailing wage) job sites.

Before being employed, the unindentured person must sign a letter of understanding with the JATC and the employer - agreeing that they are not to accumulate more than two thousand (2,000) hours as an unindentured, that they are subject to replacement by indentured apprentices and that they are not to work on wage and hour (prevailing wage) job sites.

Should an unindentured worker be selected for apprenticeship, the JATC will determine, as provided for in the apprenticeship standards, if some credit for hours worked as an unindentured will be applied toward the minimum OJT hours of apprenticeship.

The JATC may elect to offer voluntary related training to unindentured; such as Math Review, English, Safety, Orientation/Awareness, Introduction to OSHA, First-Aid and CPR.  Participation shall be voluntary.

**Section 5.11**   The employer shall contribute to the local health and welfare plans and to the National Electrical Benefit Fund (NEBF) on behalf of all apprentices and unindentured.  Contributions to other benefit plans may be addressed in other sections of this agreement.

**Section 5.12**   Each job site shall be allowed a ratio of 1 apprentice for every 3 Journeyman Wiremen(man).  The first person assigned to any job site shall be a Journeyman Wireman.

A job site is considered to be the physical location where employees report for their work assignments.  The employer's shop (service center) is considered to be a separate, single job site. All other physical locations where workers report for work are each considered to be a single, separate job site.

**Section 5.13**   An apprentice is to be under the supervision of a Journeyman Wireman at all times.  This does not imply that the apprentice must always be in sight of a Journeyman Wireman.  Journeymen are not required to constantly watch the apprentice.  Supervision will not be of a nature that prevents the development of responsibility and initiative.  Work may be laid out by the employer's designated supervisor or journeyman based on their evaluation of the apprentice's skills and ability to perform the job tasks.  Apprentices shall be permitted to perform job tasks in order to develop job skills and trade competencies.  Journeymen are permitted to leave the immediate work area without being accompanied by the apprentice.

Apprentices who have satisfactorily completed the first four years of related classroom training using the NJATC curriculum and accumulated a minimum of 6,500 hours of OJT with satisfactory performance, shall be permitted to work alone on any job site and receive work assignments in the same manner as a Journeyman Wireman.

An apprentice shall not be the first person assigned to a job site and apprentices shall not supervise the work of others.

**Section 5.14**   Upon satisfactory completion of apprenticeship, the JATC shall issue all graduating apprentices an appropriate diploma from the NJATC.  The JATC shall encourage each graduating apprentice to apply for college credit through the NJATC.  The JATC may also require each apprentice to acquire any electrical license required for journeymen to work in the jurisdiction covered by this Agreement.

**Section 5.15**   The parties to this Agreement shall be bound by the Local Joint Apprenticeship Training Trust Fund Agreement which shall conform to Section 302 of the Labor-Management Relations Act of 1947 as amended, ERISA, and other applicable regulations.

The Trustees authorized under this Trust Agreement are hereby empowered to determine the reasonable value of any facilities, materials, or services furnished by either party.  All funds shall be handled and disbursed in accordance with the Trust Agreement.

**Section 5.16**   All Employers subject to the terms of this Agreement shall contribute the amount of funds specified by the parties signatory to the local apprenticeship and training trust agreement.  The current rate of contribution is 2% of the gross monthly payroll.  This sum shall be due the Trust Fund by the same date as is their payment to the NEBF under the terms of the Restated Employees Benefit Agreement and Trust.

## ARTICLE VI
### FRINGE BENEFITS

**NEBF:**

**Section 6.01**   It is agreed that in accord with the Employees Benefit Agreement of the National Electrical Benefit Fund ("NEBF"), as entered into between the National Electrical Contractors Association and the International Brotherhood of Electrical Workers on September 3, 1946, as amended, and now delineated as the Restated Employees Benefit Agreement and Trust, that unless authorized otherwise by the NEBF the individual Employer will forward monthly to the NEBF's designated local collection agent an amount equal to 3% of the gross monthly labor payroll paid to, or accrued by, the employees in this bargaining unit, and a completed payroll report prescribed by the NEBF.  The payment shall be made by check or draft and shall constitute a debt due and owing to the NEBF on the last day of each calendar month, which may be recovered by suit initiated by the NEBF or its assignee.  The payment and the payroll report shall be mailed to reach the office of the appropriate local collection agent not later than fifteen (15) calendar days following the end of each calendar month.

The individual Employer hereby accepts, and agrees to be bound by, the Restated Employees Benefit Agreement and Trust.

An individual Employer who fails to remit as provided above shall be additionally subject to having his agreement terminated upon seventy-two (72) hours' notice in writing being served by the Union, provided the individual Employer fails to show satisfactory proof that the required payments have been paid to the appropriate local collection agent.

The failure of an individual Employer to comply with the applicable provisions of the Restated Employees Benefit Agreement and Trust shall also constitute a breach of this Agreement.

**Section 6.02**   (a) Beginning 4/30/17, the Employer will contribute and forward to the Local Union 98 Zone 2 Health and Welfare Trust Fund an amount equal to 32.48% of his gross monthly labor payroll.

**Section 6.03**   (a) Beginning 4/30/17the individual Employer will contribute and forward monthly to the Local Union 380 Pension Fund, an amount equal to $14.10, which he is obligated to pay to the employees in this bargaining unit and a completed payroll report prescribed by the Trustees.

(b) The payment and payroll report will be mailed to reach the Trustees or their designated agent not later than the last day of each calendar month.

**Section 6.04**   (a) Beginning 4/30/17, the individual Employer will contribute and forward to the Local Union 98 Zone 2 Annuity Fund, an amount equal to 8% of his gross monthly labor payroll, which he is obligated to pay to the employees in this bargaining unit, and a completed payroll report prescribed by the Trustees.

(b) The payment and payroll report will be mailed to reach the Trustees of their designated agent not later than the last day of each calendar month.

**Section 6.05**   Individual Employers who fail to remit as provided in Sections 6.02 and 6.03 and 6.04 will be additionally subject to having this Agreement terminated upon seventy-two (72) hours notice, in writing, being served by the Union, provided the individual Employer fails to show satisfactory proof that the required payments have been made.

**Section 6.06**   (a) The failure of an individual Employer to comply with the provisions of Sections 6.01, 6.02 and 6.03 and 6.04 will also constitute a breach of this labor Agreement. As a remedy for such a violation, the Labor-Management Committee and/or the Council on Industrial Relations for the Electrical Contracting Industry, as the case may be, are empowered, at the request of the Union, to require an Employer to pay into the affected Joint Trust Funds established under this Agreement any delinquent contributions to such Funds which have resulted from the violation.

(b) If, as a result of violations of this Section, Funds to institute court action to enforce an award rendered in accordance with subsection (a) above, or to defend an action which seeks to vacate such award, the Employer will pay any accountant's or attorney's fees incurred by the Union and/or Fund Trustees, plus cost of the litigation, which have resulted from the bringing of such court action.

(c) It is agreed that failure to pay wages, and/or other fringe benefits, without exception, as provided for in this Agreement by an individual Employer will be sufficient cause to having the temporary removal of electricians from such individual Employer, after receiving seventy-two (72) hours notice, in writing, by the Union, provided the individual Employer fails to show satisfactory proof that the required payments have been paid to the Local Employees' Benefit Board and the Local Union Benefit Funds.

(d) Contributions to the Local Union 98 Zone 2 Annuity Plan, Local Union 98 Zone 2 Health & Welfare Plan, Local Union 380 Pension Fund, Apprentice Training Fund, and deduction for the Local Union 98 Zone 2 Vacation Plan, shall be made in accordance with the applicable Trust document. All such contributions, as well as the working dues deduction, shall be sent to the designated depository. These payments must be received by or bear a U.S. Postal Service postmark the last day of the month following the month in which there was covered employment (the "due date"). All contributions or payments not received as stated herein shall be deemed delinquent and this delinquency shall result in the imposition of a ten percent (10%) penalty of the total contribution as well as interest at the I.R.S. rates, or portion thereof, of the total contribution until payment has been received.

(e) Employers participating in the Automated Funds Collection Procedure prescribed by the Joint Funds Trustees are required to submit all necessary data in the prescribed manner no later than the eight (8th) day of the month following the month in which the work was performed. Payment must be made in the prescribed manner no later than five days after the due date.

**Section 6.07** All amounts the Employer is required to pay pursuant to Sections 5.16 (J.A.T.C.), 6.01 (NEBF), 6.02 (Local 98 Zone 2 H&W Fund), 6.03 (Local 380 Pension Fund), 6.04 (Local 98 Zone 2 Annuity Fund), 6.06 (Delinquency Charges), 7.01 (NEIF), 7.02 (E.PA.E.C.A.F.), 8.03 (LMCC), 9.03 (NLMCC) and 9.04 (Delinquency Charges) including amounts owed by Employer pursuant to the provisions of those Sections but not yet paid, are and shall be considered as, assets of the respective Funds from the date on which the hours or wages (whether worked or paid) for which the Employer is obligated to pay contributions to the respective Funds accrue. The Employer shall not have any right, title, or interest to any sum payable by the Employer to the Fund and title to all such amounts, paid into and/or due and owing to the Fund pursuant to Sections 5.16, 6.01, 6.02, 6.03, 6.04, 6.06, 7.01, 7.02, 8.03, 9.03 and 9.04 shall be vested in the trustees of the respective Fund. Further, Employer shall set aside in a segregated account funds equal to the amount of its contributory obligation under Sections 5.16, 6.01, 6.02, 6.03, 6.04, 6.06, 7.01, 7.02, 8.03, 9.03 and 9.04 of this Agreement and such amounts shall be deemed held in trust by the Employer for payment to the respective Funds and the Employer is prohibited from using such amounts for its own purposes or for the benefit of any other person.

## ARTICLE VII
## NATIONAL ELECTRICAL INDUSTRY FUND (NEIF)

**Section 7.01**   Each individual Employer shall contribute an amount not to exceed one percent (1%) nor less than .2 of 1% of the productive electrical payroll as determined by each local Chapter and approved by the Trustees, with the following exclusions:

> 1) Twenty-five percent (25%) of all productive electrical payroll in excess of 75,000 man-hours paid for electrical work in any one Chapter area during any one calendar year but not exceeding 150,000 man hours.
>
> 2) One hundred percent (100%) of all productive electrical payroll in excess of 150,000 man-hours paid for electrical work in any one Chapter area during any one calendar year.

(Productive electrical payroll is defined as the total wages including overtime paid with respect to all hours worked by all classes of electrical labor for which a rate is established in the prevailing labor area where the business is transacted.)

Payment shall be forwarded monthly to the National Electrical Industry Fund in a form and manner prescribed by the Trustees no later than fifteen (15) calendar days following the last day of the month in which the labor was performed.  Failure to do so will be considered a breach of this Agreement on the part of the individual Employer.

**Section 7.02**   EASTERN PENNSYLVANIA ELECTRICAL CONTRACTOR ADMINISTRATIVE FUND (E.PA.E.C.A.F.).  Each Employer covered by this Agreement will contribute to the E.PA.E.C.A.F. (1/2) of (1%) of their gross labor payroll (effective January 1, 1995) for all work covered by this Agreement.  The Fund will be administered solely by the Association and will be utilized to pay for Management's costs of the labor contract administration including negotiations, disputes and grievance representation and for other administrative functions and expenses required of management, including service on fringe benefit funds.

Further, from time to time it will be utilized for promotion of the electrical contracting industry and the enhancement of labor relations in Eastern Pennsylvania.

No part of the funds collected under this trust will be used for any purpose which is held to be in conflict with the interests of the International Brotherhood of Electrical Workers and its Local Unions.

Payment will be forwarded monthly to the designated depository in a form and manner prescribed by the trustees, no later than fifteen (15) calendar days following the last day

of the month in which labor was performed. Failure to do so will be considered a breach of this Agreement by the individual Employer.

Enforcement for delinquent payments to the Fund will be the sole responsibility of the Fund or the employers and not the Local Union.

## ARTICLE VIII
## LOCAL LABOR-MANAGEMENT COOPERATION COMMITTEE (LMCC)

**Section 8.01** The parties agree to participate in a Labor-Management Cooperation Fund, under authority of Section 6(b) of the Labor Management Cooperation Act of 1978, 29 U.S.C. §175(a) and Section 302(c)(9) of the Labor Management Relations Act, 29 U.S.C. §186(c)(9). The purposes of this Fund include the following:

> 1) to improve communications between representatives of Labor and Management;
>
> 2) to provide workers and employers with opportunities to study and explore new and innovative joint approaches to achieving organizational effectiveness;
>
> 3) to assist workers and employers in solving problems of mutual concern not susceptible to resolution within the collective bargaining process;
>
> 4) to study and explore ways of eliminating potential problems which reduce the competitiveness and inhibit the economic development of the electrical construction industry;
>
> 5) to sponsor programs which improve job security, enhance economic and community development, and promote the general welfare of the community and industry;
>
> 6) to engage in research and development programs concerning various aspects of the industry, including, but not limited to, new technologies, occupational safety and health, labor relations, and new methods of improved production;
>
> 7) to engage in public education and other programs to expand the economic development of the electrical construction industry;
>
> 8) to enhance the involvement of workers in making decisions that affect their working lives; and,
>
> 9) to engage in any other lawful activities incidental or related to the accomplishment of these purposes and goals.

**Section 8.02**   The Fund shall function in accordance with, and as provided in, its Agreement and Declaration of Trust and any amendments thereto and any other of its governing documents.  Each Employer hereby accepts, agrees to be bound by, and shall be entitled to participate in the LMCC, as provided in said Agreement and Declaration of Trust.

**Section 8.03**   Each employer shall contribute $.25 per hour.  Payment shall be forwarded monthly, in a form and manner prescribed by the Trustees, no later than fifteen (15) calendar days following the last day of the month in which the labor was performed.  The Penn-Del-Jersey Chapter, NECA, or its designee, shall be the collection agent for this Fund.

**Section 8.04**   If an Employer fails to make the required contributions to the Fund, the Trustees shall have the right to take whatever steps are necessary to secure compliance.  In the event the Employer is in default, the Employer shall be liable for a sum equal to 15% of the delinquent payment, but not less than the sum of twenty dollars ($20), for each month payment of contributions is delinquent to the Fund, such amount being liquidated damages, and not a penalty, reflecting the reasonable damages incurred by the Fund due to the delinquency of the payments.  Such amount shall be added to and become a part of the contributions due and payable, and the whole amount due shall bear interest at the rate of ten percent (10%) per annum until paid.  The Employer shall also be liable for all costs of collecting the payment together with attorneys' fees.

## ARTICLE IX
## NATIONAL LABOR-MANAGEMENT COOPERATION COMMITTEE (NLMCC)

**Section 9.01**   The parties agree to participate in the NECA-IBEW National Labor-Management Cooperation Fund, under authority of Section 6(b) of the Labor Management Cooperation Act of 1978, 29 U.S.C. §175(a) and Section 302(c)(9) of the Labor Management Relations Act, 29 U.S.C. §186(c)(9).  The purposes of this Fund include the following:

> 1) to improve communication between representatives of labor and management;
>
> 2) to provide workers and employers with opportunities to study and explore new and innovative joint approaches to achieving organization effectiveness;
>
> 3) to assist worker and employers in solving problems of mutual concern not susceptible to resolution within the collective bargaining process;
>
> 4) to study and explore ways of eliminating potential problems which reduce the competitiveness and inhibit the economic development of the electrical construction industry;
>
> 5) to sponsor programs which improve job security, enhance economic and community development, and promote the general welfare of the community and the industry;
>
> 6) to encourage and support the initiation and operation of similarly constituted local labor-management cooperation committees;
>
> 7) to engage in research and development programs concerning various aspects of the industry, including, but not limited to, new technologies, occupational safety and health, labor relations, and new methods of improved production;
>
> 8) to engage in public education and other programs to expand the economic development of the electrical construction industry;
>
> 9) to enhance the involvement of workers in making decisions that affect their working lives; and

> 10) to engage in any other lawful activities incidental or related to
> the accomplishment of these purposes and goals.

**Section 9.02**   The Fund shall function in accordance with, and as provided in, its Agreement and Declaration of Trust, and any amendments thereto and any other of its governing documents.  Each Employer hereby accepts, agrees to be bound by, and shall be entitled to participate in the NLMCC, as provided in said Agreement and Declaration of Trust.

**Section 9.03**   Each employer shall contribute one cent (1¢) per hour worked under this Agreement up to a maximum of 150,000 hours per year.  Payment shall be forwarded monthly, in a form and manner prescribed by the Trustees, no later than fifteen (15) calendar days following the last day of the month in which the labor was performed. Penn-Del-Jersey Chapter, NECA, or its designee, shall be the collection agent for this Fund.

**Section 9.04**   If an Employer fails to make the required contributions to the Fund, the Trustees shall have the right to take whatever steps are necessary to secure compliance. In the event the Employer is in default, the Employer shall be liable for a sum equal to a 15% of the delinquent payment, but not less than the sum of twenty dollars ($20), for each month payment of contributions is delinquent to the Fund, such amount being liquidated damages, and not a penalty, reflecting the reasonable damages incurred by the Fund due to the delinquency of the payments.  Such amount shall be added to and become a part of the contributions due and payable, and the whole amount due shall bear interest at the rate of ten percent (10%) per annum until paid.  The Employer shall also be liable for all costs of collecting the payment together with attorneys' fees.

## ARTICLE X
## SAFETY

**Section 10.01** The Labor Management Committee will serve as the Safety Committee. The duties of this Committee will be to develop and recommend safe work rules that are equal to or greater than, the Standards of Construction as established by the Occupational Safety and Health Act of 1970, or other applicable Federal or State laws. Any proposed changes or revisions in these safe work rules will be included in this Agreement.

**Section 10.02** This Committee will meet at least once each quarter and also when called by the Chairman or when called by a majority of the current Committee members. Meetings to become a part of the regular monthly Labor Management Committee meetings.

**Section 10.03** Two employees will work together on all energized circuits of 440 Volts AC or 250 Volts DC, or respective higher voltages.

**Section 10.04** Employees will not be required to work on wires or cables when the difference in potentials is over 200 Volts between any two conductors or between any conductor or ground. In no case will employees be required to work on energized cables carrying in excess of 480 Volt circuit.

**Section 10.05** No employees will be compelled to use a powder actuated tool. Only qualified employees will be permitted to use power actuated tools. (Valid licenses.)

**Section 10.06** The Employer will furnish hard hats when such are required and will also furnish proper individual protective gear to workmen engaged in burning and welding operations.

**Section 10.07** The safe work practices that are in effect on customer's properties which are more stringent than those in this Agreement will apply to work performed on that property under the terms of this Agreement.

**Section 10.08** It is the Employer's exclusive responsibility to insure the safety of its employees and their compliance with these safety rules and standards.

**Section 10.09** Employees failing to cooperate and who do not use protective gear that is furnished will be terminated by the contractor or the contractor's representative on the job.

**ARTICLE XI**
**SUBSTANCE ABUSE**

**Section 11.01** The dangers and costs that alcohol and other chemical abuses can create in the electrical contracting industry in terms of safety and productivity are significant. The parties to this Agreement resolve to combat chemical abuse in any form and agree that, to be effective, programs to eliminate substance abuse and impairment should contain a strong rehabilitation component. The local parties recognize that the implementation of a drug and alcohol policy and program must be subject to all applicable federal, state, and local laws and regulations. Such policies and programs must also be administered in accordance with accepted scientific principles, and must incorporate procedural safeguards to ensure fairness in application and protection of legitimate interests of privacy and confidentiality. To provide a drug-free workforce for the Electrical Construction Industry, each IBEW local union and NECA chapter shall implement an area-wide Substance Abuse Testing Policy. The policy shall include minimum standards as required by the IBEW and NECA. Should any of the required minimum standards fail to comply with federal, state, and/or local laws and regulations, they shall be modified by the local union and chapter to meet the requirements of those laws and regulations.

## ARTICLE XII
## CODE OF EXCELLENCE

**Section 12.01** The parties to this agreement recognize that to meet the needs of our customers, both employer and employee must meet the highest levels of performance, professionalism, and productivity. The Code of Excellence has proven to be a vital element in meeting the customers' expectations. Therefore each IBEW local union and NECA chapter shall implement a Code of Excellence Program. The program shall include minimum standards as required by the IBEW and NECA.

The Code of Excellence is a program designed to bring out the best in our construction members and demonstrates to our customer that IBEW members:

- Perform the highest quality and quantity of work
- Utilize their skills and abilities to the maximum
- Exercise safe and productive work practices

The Code of Excellence is not only about an IBEW job built right the first time, on schedule and under budget; it is also about pride in IBEW membership and craftsmanship and leaving a lasting impression of quality workmanship with the customer ... thus, prompting him to again employ the IBEW on future projects. The Code of Excellence program is also a means to build and project positive attitudes about who we are and the work we do ... on and off the job

Local Union training with respect to the Code of Excellence program may be facilitated by an International Representative but, regardless of delivery method or by whom, the Code of Excellence program training is to convey a strong message that IBEW construction members will:

**C**ome to work on time, fit for duty and ready to work.
**O**bey recognized customer and employer work rules.
**D**emonstrate zero tolerance for alcohol and substance abuse.
**E**xercise proper safety, health and sanitation practices.

**O**wn up to '8 for 8' and be on the job unless otherwise allowed or authorized to leave.

**F**ollow safe, reasonable and legitimate management directives.

**E**ncourage respect for the customer's rights and property, as well as for others.
e**X**ercise the skills and abilities of the trade.

**C**are for tools and equipment provided by the employer.

**E**liminate waste and other forms of property destruction, including graffiti.

**L**imit lunch and break times to allocated periods; adhere to established start and quit times.

**L**eave inappropriate behavior to those of lesser knowledge.

**E**mploy the proper tool for the job and maintain personal tool responsibilities.

**N**ot solicit funds or sell merchandise without the Business Manager's approval.

**C**urtail idle time or pursuit of personal business during work hours, including cell phone use.

**E**xpel job disruptions and refuse to engage in slowdowns or activities designed to extend the job or create overtime or any other conduct that conduct that would case the IBEW in a bad light.

**SEPARABILITY CLAUSE**

Should any provision of this Agreement be declared illegal by any court of competent jurisdiction, such provisions shall immediately become null and void, leaving the remainder of the Agreement in full force and effect and the parties shall, thereupon, seek to negotiate substitute provisions which are in conformity with the applicable laws.

Signed for:

Norristown Division                              Local Union 98 Zone 2, IBEW
Penn-Del-Jersey Chapter, N.E.C.A.      AFL-CIO

_____               _____
Steve Bolef                                          John J. Dougherty, Business Manager.

_____               _____
Frank Holleran                                      Brian Burrows, President

_____
Jeffrey Scarpello, Executive Director

INDIVIDUAL LETTER OF ASSENT-A

In signing this letter of assent, the undersigned firm does hereby authorize the Philadelphia Division, Penn-Del-Jersey Chapter, N.E.C.A. as its collective bargaining representative for all matters contained in or pertaining to the current and any subsequent approved Inside Commercial labor agreement between the Philadelphia Division, Penn-Del-Jersey Chapter, N.E.C.A. and Local Union 98, I.B.E.W. In doing so, the undersigned firm agrees to comply with, and be bound by, all of the terms and conditions contained in said current and subsequent approved labor agreements. This authorization, in compliance with the current approved labor agreement, shall become effective on the _____ day of _____, 20____. It shall remain in effect until terminated by the undersigned Employer giving written notice to the Philadelphia Division, Penn-Del-Jersey Chapter, N.E.C.A. and to the Local Union at least one hundred fifty (150) days prior to the then current anniversary date of the applicable approved labor agreement.

The Employer agrees that if a majority of its Employees authorizes the Local Union to represent them in collective bargaining, the Employer will recognize the Local Union as the NLRA Section 9 (a) collective bargaining agent for all employees performing electrical construction work within the jurisdiction of the Local Union on all present and future jobsites.

In accordance with Orders issued by the United States District Court for the District of Maryland on October 10, 1980, in Civil Action HM-77-1302, if the undersigned Employer is not a member of the National Electrical Contractors Association, this letter of assent shall not bind the parties to any provision in the above-mentioned agreement requiring payment into the National Electrical Industry Fund, unless the above Orders of Court shall be stayed, reversed on appeal, or otherwise nullified.

SUBJECT TO THE APPROVAL OF THE INTERNATIONAL PRESIDENT - I.B.E.W.

Firm: _____

SIGNED FOR THE EMPLOYER

By: _____

Title: _____

Date: _____

SIGNED FOR LOCAL UNION 98, I.B.E.W.

By: _____

Title: _____

Date: _____

# LEAVE BLANK
# FOR STAPLED IN RATE SHEET

**LETTER OF ASSENT - A**

In signing this letter of assent, the undersigned firm does herby authorize[1]   PENN-DEL-JERSEY CHAPTER N.E.C.A.

as its collective bargaining representative for all matters contained in or pertaining to the current and any subsequent

approved[2]   INSIDE                                                                                                  labor agreement between the

[1]   PENN-DEL-JERSEY CHAPTER N.E.C.A.                            and Local Union[3]   0380          , IBEW.

In doing so, the undersigned firm agrees to comply with, and be bound by, all of the provisions contained in said current and subsequent

approved labor agreements. This authorization, in compliance with the current approved labor agreement, shall become effective

on the[4]  11TH        day of  JUNE                        ,  2009         .

It shall remain in effect until terminated by the undersigned employer giving written notice to the

[1]   PENN-DEL-JERSEY CHAPTER N.E.C.A.                                        and to the Local Union at least one hundred fifty (150)

days prior to the then current anniversary date of the applicable approved labor agreement.

The Employer agrees that if a majority of its employees authorize the Local Union to represent them in collective bargaining, the Employer will recognize the Local Union as the NLRA Section 9(a) collective bargaining agent for all employees performing electrical construction work within the jurisdiction of the Local Union on all present and future jobsites.

In accordance with Orders issued by the United States District Court for the District of Maryland on October 10, 1980, in Civil Action HM-77-1302, if the undersigned employer is not a member of the National Electrical Contractors Association, this letter of assent shall not bind the parties to any provision in the above-mentioned agreement requiring payment into the National Electrical Industry Fund, unless the above Orders of Court shall be stayed, reversed on appeal, or otherwise nullified.

SUBJECT TO THE APPROVAL OF THE INTERNATIONAL PRESIDENT, IBEW
MBR CONSTRUCTION SERVICES, INC.
[5] Name of Firm
P.O. BOX 14775 - EXCELSIOR INDUSTRIAL PARK
Street Address/P.O. Box Number
READING, PA 19612
City, State (Abbr.) Zip Code
[6] Federal Employer Identification No.: 20-1267959

SIGNED FOR THE EMPLOYER
BY[7]
NAME[8]   Kenneth Fida
(original signature)
TITLE/DATE   CEO   6/23/09

SIGNED FOR THE UNION[3]   0380   , IBEW
BY[7]
NAME[8]  DAVID M. SCHAAF
(original signature)
TITLE/DATE  BUSINESS MANAGER 06-11-2009

INSTRUCTIONS (All items **must** be completed in order for assent to be processed)

[1] NAME OF CHAPTER OR ASSOCIATION
Insert full name of NECA Chapter or Contractors Association involved.
[2] TYPE OF AGREEMENT
Insert type of agreement. Example: Inside, Outside Utility, Outside Commercial, Outside Telephone, Residential, Motor Shop, Sign, Tree Trimming, etc. The Local Union must obtain a separate assent to each agreement the employer is assenting to.
[3] LOCAL UNION
Insert Local Union Number.
[4] EFFECTIVE DATE
Insert date that the assent for this employer becomes effective. Do not use agreement date unless that is to be the effective date of this Assent.

[5] EMPLOYER'S NAME & ADDRESS
Print or type Company name & address.

[6] FEDERAL EMPLOYER IDENTIFICATION NO.
Insert the identification number which must appear on all forms filed by the employer with the Internal Revenue Service.

[7] SIGNATURES
[8] SIGNER'S NAME
Print or type the name of the person signing the Letter of Assent. International Office copy must contain actual signatures-not reproduced-of a Company representative as well as a Local Union officer.

A MINIMUM OF FIVE COPIES OF THE JOINT SIGNED ASSENTS MUST BE SENT TO THE INTERNATIONAL OFFICE FOR PROCESSING. AFTER APPROVAL, THE INTERNATIONAL OFFICE WILL RETAIN ONE COPY FOR OUR FILES, FORWARD ONE COPY TO THE IBEW DISTRICT VICE PRESIDENT AND RETURN THREE COPIES TO THE LOCAL UNION OFFICE. THE LOCALUNION SHALL RETAIN ONE COPY FOR THEIR FILES AND PROVIDE ONE COPY TO THE SIGNATORY EMPLOYER AND ONE COPY TO THE LOCAL NECA CHAPTER.

# Exhibit B



CLEARY,
JOSEM &
TRIGIANI

CLEARY, JOSEM & TRIGIANI LLP
Constitution Place
325 Chestnut Street, Suite 200
Philadelphia, PA 19106
215.735.9099
Fax: 215.640.3201
www.cjtlaw.org
E-Mail: labor@cjtlaw.org

**Jeremy E. Meyer**
jmeyer@cjtlaw.org
Admitted in PA & NJ

July 17, 2018

MBR Construction Services, Inc.
307 June Avenue
Blandon, PA 19510

### Re:   IBEW Local 98 Benefit Plans
### MBR Construction Services, Inc.

To Whom It May Concern:

This office represents the IBEW Local 98 Benefit Plans (the "Funds"). As you know, pursuant to a collective bargaining agreement, MBR Construction Services, Inc. (the "Company") is obligated to contribute to the Plans on a monthly basis. Contributions that are not submitted by the last day of the month following the reporting month accrue interest on a daily basis and liquidated damages equal to 10% of the principal delinquent amount.

It has come to my attention that the Company made only a partial payment towards it March 2018 contribution to the Funds. A principal delinquency of $37,982.58 remains for that month, which has accrued $1,911.70 in interest, and $5,207.24 in liquidated damages for a total of **$45,089.81** due. If you have not paid that amount, you must do so immediately. Submit your payment to: Attn: Janice Noble, IBEW Local Union No. 98 Benefit Fund Office, c/o Frank M. Vaccaro & Assoc., 1719 Spring Garden Street, Philadelphia, PA 19130.

If the Funds do not receive full payment within twenty (20) days from the date of this letter, the Funds reserve the right take such necessary legal action to collect the amounts owed. If a lawsuit is filed, the Plans will ask the Court to award not only the outstanding interest and liquidated damages, but also attorneys' fees and the costs of litigation. See 29 U.S.C. §1132(g)(2)(D).

We sincerely hope that such legal action will not be necessary and ask that you immediately respond to this letter. Should you have any questions, please contact the undersigned.

Sincerely,

JEREMY E. MEYER
cc:   Kristina Kaulinis (by email)